**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UIRC-GSA Holdings Inc., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| William Blair & Company, L.L.C., | ) | |
| And Michael Kalt, | ) | |
| Defendants, | ) | |
| _____ | ) | |
| William Blair & Company, L.L.C., | ) | |
| Counter-Plaintiff, | ) | Case No. 15-CV-9518 |
| | ) | |
| v. | ) | Hon. Amy J. St. Eve |
| | ) | |
| UIRC-GSA Holdings, Inc. and | ) | |
| Urban Investment Research Corp., | ) | |
| Counter-Defendants, | ) | |
| _____ | ) | |
| William Blair & Company, L.L.C., | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Rainier Realty Acquisition Gp., L.L.C., and | ) | |
| Rainier GSA Portfolio I, L.L.C., | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On April 12, 2016, Plaintiff UIRC-GSA Holdings, Inc. ("UIRC") brought its Fourth

Amended Complaint against Defendants William Blair & Company ("Blair") and Michael Kalt,

collectively, "Defendants," alleging copyright infringement in violation of 17 U.S.C. § 101 *et*

*seq.* and professional negligence.  Blair has since filed a third-party complaint against Rainier

Realty Acquisitions GP ("RRA") and Rainer GSA Portfolio I ("Rainier GSA") (RRA and

Rainier GSA collectively "Rainier" or "Third-Party Defendants") alleging that RRA and Rainier

GSA each have a duty to indemnify Blair against UIRC's claims in this litigation and breach of contract claims against both entities.  RRA has moved to dismiss Count V (implied indemnity), and Rainier has collectively moved to dismiss Counts III (contractual indemnity against Rainier GSA), IV (breach of contract against Rainier GSA), and VII (contractual contribution against Rainier GSA) of Blair's complaint.

## BACKGROUND

Blair was UIRC's investment banker in connection with its bond offering, the proceeds of which were used to acquire a portfolio of real estate properties.  (R. 89, Fourth Am. Compl. ¶ 6.) This case arises from Blair's alleged copyright infringement of UIRC's bond documents and use of those documents to solicit other clients.  (*Id.* ¶¶ 13-16.)  In considering this motion, the Court presumes familiarity with the background of this action as set forth in previous orders and does not recite a detailed background here.  The Court will provide a brief factual background, particularly as it pertains to the new allegations in Blair's Amended Third-Party Complaint.

## I.  Factual Background

RRA is a Texas real estate investment company that provides preferred equity and mortgage debt to quality commercial properties in growth markets throughout the United States, and specifically it is in the business of acquiring and operating GSA buildings, some of which are financed through the sale of GSA revenue bonds.  (R. 148, Am. Third-Party Compl. ¶¶ 2-3.) Blair alleges that RRA has "formed supervised or controlled the formation of at least 18 portfolio companies, each of which was formed to be the borrower for a particular bond offering," and typically these portfolio companies are called "Rainier GSA Portfolio. . ." (*Id.* ¶ 4.)

On or about February 5, 2015, Blair entered into an engagement agreement with RRA to render financial advisory and investment banking services (the "Rainier Engagement Letter").

(*Id.* ¶ 10.)  Under the Rainier Engagement Agreement, Blair was tasked with assisting RRA with the issuance of GSA revenue bonds for the acquisition of a portfolio of properties leased to the GSA.  (*Id.* ¶ 11.)  Blair was required to assist in the preparation of any solicitation materials, the private placement memorandum used for the deal, and other offering materials.  (*Id.*)  In the Agreement, RRA acknowledged that "Blair is not and will not be construed as a fiduciary of [RRA] and will have no duties or liability to . . . [RRA] . . . by virtue of this agreement, and the retention of Blair hereunder, all of which duties and liabilities are hereby expressly waived."  (*Id.* ¶ 12.)  RRA also agreed to rely on its own counsel and advisors for "legal, accounting, tax, and similar advice."  (*Id.*)  Blair alleges that RRA understood and agreed that it was solely responsible for the documents prepared in connection with its own GSA revenue bond offering and that Blair was not offering RRA legal advice under the Agreement.  (*Id.* ¶ 13.)

On or about January 30, 2015, Blair and RRA separately entered into an indemnity agreement (the "Rainier Indemnity Agreement"), which they incorporated by reference into the Rainier Engagement Agreement.  (*Id.* ¶ 14.)  In the Indemnity Agreement, RRA agreed to indemnify and hold harmless Blair "from and against any and all losses, claims, damages, or liabilities (collectively, 'Losses') and reasonable expenses incurred by them (including all fees and expenses of Blair's . . . incurred at [RRA's] request or otherwise incurred and reasonably required in connection with the investigation of any pending or threatened claims or preparation for any pending or threatened litigation or other proceedings) . . . arising out of or relating to Blair's engagement under such letter agreement."  (*Id.* ¶ 15.)  The Indemnity Agreement also states that RRA "will not, without the prior written consent of Blair, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder . . . unless such

settlement . . . includes an unconditional release of Blair . . . from all liability arising out of such claim, action, suit, or proceeding." (*Id.* ¶ 16.) The Indemnity Agreement also indemnifies "Other Identified Parties" including "the respective members, principals . . . of Blair and its affiliates." (*Id.* ¶ 17.) The Agreement also included a "Contribution Clause" providing that if the indemnification was unavailable to Blair, RRA "shall contribute to the amount paid or payable by Blair . . . as a result of such Loss in such proportion as is appropriate to reflect no only the relative benefits received by [Blair and RRA] but also the relative fault of [Blair and RRA]." (*Id.* ¶ 18.) In connection with Blair's engagement with RRA, Blair worked with RRA on deal documents governing the issuance of GSA revenue bonds on behalf of RRA. (*Id.* ¶ 19.)

Blair also represented UIRC on unrelated deals and worked with UIRC on placement memoranda relating to the creation and issuance of revenue bonds relating to different GSA properties. (*Id.* ¶ 25.) UIRC filed a copyright infringement lawsuit against Rainier GSA and served a subpoena on Blair seeking certain documents, and, after responding to the subpoena, Blair sent a letter to RRA's counsel notifying RRA of its costs and expenses incurred in relation to the subpoena and reserving the right to seek reimbursement pursuant to the Rainier Indemnity Agreement. (*Id.* ¶¶ 26-29.) Blair did not receive a response from RRA. (*Id.* ¶ 29.) On October 11, 2016, UIRC settled with Rainier GSA, but Blair never received any notice from RRA of the settlement as the Indemnity Agreement required, nor did RRA request Blair's consent to settle the underlying action with UIRC or obtain an unconditional release from UIRC of Blair relating to any claims in this case. (*Id.* ¶¶ 30-31.) Blair claims, on information and belief, that RRA had no intention of abiding by its obligations to Blair under the Indemnity Agreement, and thus attempted to secretly settle with UIRC to remove itself from the litigation. (*Id.* ¶ 32.)

Also on October 11, 2016, UIRC filed an amended complaint against Blair, relating to its work for RRA. (*Id.* ¶ 33.) On November 4, 2016, Blair's counsel sent RRA a renewed demand for indemnification and defense and notified RRA of its breach of the Indemnity Agreement, but on December 13, 2016, RRA declined Blair's request for indemnification. (*Id.* ¶¶ 34-35.) Since the filing of the complaint against Blair, Blair has incurred significant legal costs and expenses defending itself against UIRC's claims, which arise from RRA's engagement. (*Id.* ¶ 37.)

## II.    Alter Ego Allegations

Blair alleges that, at some time following the execution of the Engagement Agreement, RRA formed Rainier GSA under the supervision and control of Robert Jones, president of RRA. (*Id.* ¶ 20.) RRA and Rainier GSA have the same business address—13760 Noel Road, Suite 800, Dallas, Texas. (*Id.* ¶ 21.) Blair alleges that RRA formed Rainier GSA as a "single, special-purpose and bankruptcy-remote entity to carry out the bond offering contemplated by [RRA's] agreements with Blair." (*Id.* ¶ 22.) Specifically, Blair alleges that RRA formed Rainier GSA with the sole purpose of issuing the GSA bonds described in RRA's agreements with Blair and owning the entities that acquired each separate commercial property as part of the offering. (*Id.* ¶ 23.) Blair claims that RRA formed Rainier GSA for the sole purpose of owning each property-owning entity and issuing and securing all the bonds necessary to acquire the properties. (*Id.* ¶ 24.) Blair further alleges that RRA referred to itself as Rainier GSA's "sponsor" in this transaction and provided the acquisition debt and equity. (*Id.*)

Blair also alleges that Rainier GSA has no separate personality from RRA and is merely an "alter ego" of RRA for purposes of Blair's claim. (*Id.* ¶ 38.) Blair claims that Rainier GSA exists solely as the issuer of the bond offering RRA and Blair prepared and as such, is a "mere façade" of RRA's operations handling the bond offering. (*Id.* ¶ 39.) According to Blair, RRA

and Robert Jones, RRA's President, exclusively manage Rainier GSA for the sole purpose of issuing bonds RRA and Blair offered.  (*Id.* ¶ 40.)  Rainier GSA does not file an annual franchise tax report, does not have functioning officers and directors, does not have formal shareholder or director meetings, and thus, Blair claims that it fails to observe corporate formalities.  (*Id.* ¶¶ 41-43.)  In addition, Blair alleges that adhering to the fiction of separation between RRA and Rainier GSA would promote injustice because it would allow RRA to argue that Rainier GSA's settlement with UIRC did not trigger any notice obligation for RRA thus leaving Blair without the benefit of its bargain in the Indemnity Agreement and allowing RRA to intentionally avoid its indemnification and notice obligations to Blair.  (*Id.* ¶¶ 44-45, 47.)  Blair also alleges, on information and belief, that this fictional separation between the entities allowed Rainier GSA to enter into a settlement agreement with UIRC that released RRA from liability. (*Id.* ¶ 46.) According to Blair, Rainier GSA's managing members are all "co-founders of Rainier Companies" and Rainier GSA shares a business address with RRA.  (*Id.* ¶ 48.)

### III.    Procedural Background

While the Court has issued several opinions in this litigation, the only opinion relevant to this motion is the Court's August 25, 2017 Opinion dismissing Blair's Third-Party Complaint without prejudice.  (R. 142, August 25, 2017 Opinion.)  In that Opinion, the Court dismissed Blair's contractual claims against Rainier GSA because only RRA and Blair were parties to the Engagement Agreement and the Agreement did not apply to RRA's subsidiaries.  (*Id.* 6-7.)  The Court also refused to pierce RRA's corporate veil because Blair had not alleged sufficient facts, or any facts at all, to warrant a finding that Rainier GSA was Blair's alter ego.  (*Id.* 8-10.)  The Court also dismissed Blair's implied indemnity claim because the parties had already included an indemnity provision in the Engagement Agreement, because Blair failed to allege a qualitative

difference between Blair and RRA's conduct, and because Blair failed to allege vicarious liability. (*Id.* 10-12.)

## LEGAL STANDARD

"Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted." *Hill v. Serv. Employees Int'l Union*, 850 F.3d 861, 863 (7th Cir. 2017). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007) (citation omitted). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). In determining the sufficiency of a complaint under the plausibility standard, courts must "accept as true all of the well-pleaded facts in the complaint and draw reasonable inferences in favor of [the] plaintiffs." *Hill*, 850 F.3d at 863; *see also Roberts v. City of Chi.*, 817 F.3d 561, 564 (7th Cir. 2016).

## ANALYSIS

Third-Party Defendants argue that the Court should dismiss Counts III (contractual indemnity against Rainier GSA), IV (breach of contract against Rainier GSA), and VII (contractual contribution against Rainier GSA) because only RRA was a party to the Engagement Agreement and Indemnity Agreement with Blair, and Blair failed to sufficiently allege that Rainier GSA is an alter ego of RRA, thus, Rainier GSA is not liable for any of RRA's

contractual failures. Third-Party Defendants also argue that the Court should dismiss Blair's

equitable indemnity claim because Blair has failed to sufficiently allege the common law

elements of equitable indemnity. The Court addresses each argument in turn.

## I.    Contractual Claims

Under Illinois law,[1] to establish alter ego liability, "(1) there must be such unity of

interest and ownership that the separate personalities of the corporation and the individual no

longer exist; and (2) circumstances must be such that adherence to the fiction of separate

corporate existence would sanction a fraud or promote injustice." *Wachovia Sec., LLC v. Banco*

*Panamericano, Inc.*, 674 F.3d 743, 751–52 (7th Cir. 2012) (citations and quotations omitted).

When determining whether a unity of interest and ownership exists to justify disregarding

separate corporate identities, courts look to the following factors:

> "inadequate capitalization; failing to issue stock; failing to observe corporate formalities;
> failing to pay dividends; corporate insolvency; nonfunctioning corporate officers; missing
> corporate records; commingling funds; diverting assets to an owner or other entity to
> creditor detriment; failing to maintain an arm's-length relationship among related entities;
> and whether the corporation is a mere façade for a dominant owner."

*Id.* at 752; *see also Sea–Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 521 (7th Cir. 1991)

(listing factors including (1) failure to maintain corporate records, (2) commingling of funds or

assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation

as its own). No single factor is determinative, *Wachovia*, 674 F.3d at 752, and the Court's

inquiry "invariably involves factual questions to be determined by the circumstances of each

case." *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 463 (7th Cir. 1991).

---

[1] In this case, the Court has jurisdiction over UIRC's federal copyright claims and supplemental
jurisdiction over this action, but in determining whether alter ego liability applies, the federal courts look
to the law of the forum state. *In re Schwarzkopf*, 626 F.3d 1032, 1037 (9th Cir. 2010); *see also ABN
AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 854 (N.D. Ill. 2008) (applying Illinois law
to alter ego claims in federal securities law action).

The Court may apply alter ego liability to contractual claims. *See, e.g.*, *VDF Futureceuticals, Inc. v. Lewis*, No. 1:13-CV-00407, 2013 WL 4506937, at *4 (N.D. Ill. Aug. 22, 2013) (piercing corporate veil in breach of contract claim); *United States v. All Meat & Poultry Prod. Stored at Lagrou Cold Storage*, 470 F. Supp. 2d 823, 827 (N.D. Ill. 2007) (same). In a breach of contract case, however, piercing the corporate veil is even more difficult and courts often require "additional compelling facts." *Saletech, LLC v. E. Balt, Inc.*, 20 N.E.3d 796, 806 (1st Dist. 2014) (citations omitted); *see also Tower Investors*, 371 Ill. App.3d at 1034 (requiring "additional compelling facts); *RehabCare Grp. E., Inc. v. Certified Health Mgmt., Inc.*, No. 07 C 2923, 2007 WL 3334500, at *2 (N.D. Ill. Nov. 8, 2007) (noting it is "even more difficult" to pierce the corporate veil in a breach of contract case).

The parties dispute whether, in alleging alter ego liability, Blair must meet the heightened pleading standards required under Rule 9(b) for allegations of fraud or merely the notice pleading standards of Rule 8(a). Although the Seventh Circuit has not definitively resolved this issue,[2] to state an alter ego theory, "plaintiffs typically are only required to satisfy the notice pleading standards of Rule 8(a)." *United States v. Sullivan*, No. 10 CR 821-1, 2016 WL 1626622, at *10 (N.D. Ill. Apr. 21, 2016) (citing *Flentye*, 485 F. Supp. 2d at 913); *Wachovia Secs., LLC v. Neuhauser,* No. 04 C 3082, 2004 WL 2526390, at *11 (N.D. Ill. Nov.05, 2004) (Rule 9(b) "generally does not apply to piercing allegations"). Indeed, "[w]here a claimant fairly alleges an entity exists as the alter ego of another and provides factual manifestations suggesting the existence that the two operate as a single entity, a motion to dismiss will be denied." *Id.* (citing *Keller Sys., Inc. v. Transp. Int'l Pool, Inc.*, 172 F. Supp. 2d 992, 1001 (N.D. Ill.

---

[2] *See Spiegel v. Carlson*, No. 1:15-CV-01809, 2016 WL 5477529, at *9 (N.D. Ill. Sept. 29, 2016) ("[T]he Seventh Circuit has yet to opine about the appropriate pleading standard for veil piercing when fraud allegations are in play.").

2001)); *see also Hann v. Paul Revere Ins. Co.*, No. 03 C 1062, 2004 WL 557380, at *2 (N.D. Ill. Feb. 17, 2004) (if plaintiff alleges alter ego relationship, "dismissal of her complaint is unwarranted if she alleges any facts which suggest that the corporations operated as a single entity").

Applying these standards, courts have denied motions to dismiss where the plaintiff alleged that the defendant created a subsidiary for the purpose of the transaction at issue, the parent entity completely controlled that subsidiary, and the subsidiary did not have its own funds or observe corporate formalities. In *All Meat*, 470 F. Supp. 2d at 825, for example, the plaintiffs brought a lawsuit against a parent entity and related entities for breach of contract. The court denied the defendants' motion to dismiss the plaintiffs' allegations that all the entities could be held liable under an alter ego theory. *Id.* at 828. The court reasoned that the plaintiffs' allegations that "the corporate defendants h[e]ld themselves out as one integrated system and operate[d] as such" and that the individual defendant who owned the primary corporate entity "manage[d] each of the corporate defendant [entities] and operate[d] them as mere instrumentalities of his own enterprise" were sufficient to survive the motion to dismiss. *Id.* Similarly, in *Flentye*, 485 F. Supp. 2d at 913, the court found that the plaintiffs had sufficiently alleged an alter ego theory where they alleged that the parent entity plaintiff owned the subsidiary, created it "for the sole purpose of holding title to local real estate through which" the parent operated its holdings, and that the same individual director operated and controlled both entities. *See also Fuller v. Midland Credit Mgmt. Inc.*, No. 11 C 5111, 2014 WL 883757, at *8 (N.D. Ill. Mar. 6, 2014) (refusing to dismiss alter ego claim because plaintiff alleged parent entity devised key policies for subsidiary, parent officers worked out of subsidiary office, corporate form existed only to insulate parent from liability, and subsidiary acted at direction of

parent); *Kellers*, 172 F. Supp. 2d at 1001 (plaintiffs sufficiently alleged alter ego because entities commingled assets and used accounts interchangeably such that they could be considered a single entity); *Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, No. 92 C 20259, 1996 WL 67216, at *3 (N.D. Ill. Feb. 16, 1996) (alter ego allegations sufficient where subsidiary's sole purpose was to conduct business of parent).

Here, while Blair's original Third-Party Complaint did not contain any allegations about the corporate structure of RRA and Rainier GSA, Blair's Amended Third-Party Complaint contains several allegations describing RRA and Rainier's GSA's corporate structure and how that structure indicates that there is a unity of interest and ownership between the two entities. Blair has alleged, for example, that RRA and Rainier GSA share a business location, that RRA members are the sole managers and directors of Rainier GSA, and that Rainier GSA fails to observe corporate formalities such as filing franchise tax reports, maintaining active directors, or holding formal shareholder meetings. (Am. Third-Party Compl. ¶¶ 21, 41-43, 48.) More importantly, similar to *Flentye*, 485 F. Supp. 2d at 913, where the court refused to dismiss alter ego allegations because the plaintiffs had alleged that the defendant created a subsidiary "for the sole purpose of holding title to local real estate" through which it operated its holdings, here, Blair has alleged that RRA created Rainier GSA for sole purpose of issuing the GSA bonds at issue in this litigation. Specifically, Blair has alleged that Robert Jones, the president of RRA, created Rainier GSA as a "single, special-purpose and bankruptcy-remote entity to carry out the bond offering contemplated by [RRA's] agreements with Blair." (Am. Third-Party Compl. ¶ 22.) Essentially, Blair alleges RRA was Rainier GSA's "sponsor" for purposes of the Blair-RRA bond offering, and RRA provided the acquisition debt and equity to acquire the bonds used to buy the property Rainier GSA would ultimately own. (*Id.* 23-24.) Viewing these allegations in

the light most favorable to Blair, they sufficiently allege that Rainier GSA was a "mere instrumentalit[y]" of RRA that RRA used for the sole purpose of issuing the bonds and holding the property contemplated by RRA's agreement with Blair. *All Meat*, 470 F. Supp. 2d at 828.

Blair has also sufficiently alleged that adhering to the fiction of RRA and Rainier GSA's separate corporate existences would promote injustice. Specifically, Blair has alleged that while RRA created Rainier GSA for the sole purpose of assisting with the RRA-Blair bond offering and operated Rainier GSA as an integrated part of RRA's bond offering operation, RRA is now attempting to avoid its contractual responsibilities to Blair on the basis of the fiction of a corporate separation between RRA and Rainier GSA. (Am. Third-Party Compl. ¶¶ 22-24.) Blair alleges, more precisely, that RRA used the existence of Rainier GSA to settle its litigation with UIRC without triggering the notice obligations in the RRA-Blair Indemnity Agreement, thereby allowing RRA to skirt its contractual duties and leaving Blair without the benefit of its contract. (Am. Third-Party Compl. ¶¶ 44-45, 47.) Blair also alleges that RRA used the fictional separation of the two entities to aid Rainier GSA's settlement negotiations with UIRC in the original litigation and ensure that RRA avoided liability to either UIRC or Blair. (*Id.* ¶ 46.) These allegations are the type of compelling facts that suggest that adhering to the fiction of RRA and Rainier GSA's separate corporate existences would promote injustice.

In sum, viewing the allegations in Blair's favor, it has now sufficiently alleged that Rainier GSA is an alter ego of RRA and that adhering to Rainier GSA's fictional corporate existence would promote injustice. Here, Blair has alleged that RRA created Rainier GSA and operated it as an integrated entity with RRA for the sole purpose of issuing the bonds contemplated by the RRA-Blair Engagement Agreement. Allowing RRA to then use Rainier GSA, its alleged alter ego, to avoid the contractual obligations of RRA's agreement with Blair

would promote the type of injustice that alter ego liability is intended to prevent. *VDF Futureceuticals*, 2013 WL 4506937, at *4 (finding adherence to fiction of separate entities would promote injustice where defendant would be able to avoid obligations under contract if corporate veil not pierced).

Accordingly, the Court denies Third-Party Defendants' motion to dismiss Blair's contractual claims against Rainier GSA (Counts III, IV, and VII).[3]

## II.    Implied Indemnity Claim

Third-Party Defendants next argue that the Court should dismiss Blair's implied indemnity claim because the parties agreed upon an indemnity provision and because Blair has failed to sufficiently allege the common law elements of implied indemnity.

As the Court has previously explained, equitable or implied indemnity based on tort principles of relative blameworthiness no longer exists in Illinois. *Truck Components, Inc. v. K-H Corp.*, No. 94 C 50250, 1995 WL 692541, at *11 (N.D. Ill. Nov. 22, 1995) (citing *American Nat'l Bank and Trust Co. v. Columbus–Cuneo–Cabrini Medical Ctr.*, 154 Ill. 2d 347 (1992)). Implied indemnity, however, is viable in the quasi-contractual context, but only if premised on vicarious liability. *Id.* at 288–89. "Implied indemnity generally rises where the parties have failed to include an indemnity provision in an agreement and there is reason for the court to read such a provision into the agreement." *Mizuho Corporate Bank v. Corey & Assoc., Inc.*, 341 F.3d 644, 652 (7th Cir. 2003) (citations omitted). "To establish [an implied indemnity] claim, [a plaintiff] must allege a pre-tort relationship with [the defendant] and a qualitative difference in their conduct in the occurrence." *Canadian Pac. Ry. Co. v. Williams-Hayward Protective*

---

[3] Because the Court has denied Third-Party Defendants' motion to dismiss Blair's contractual claims against Rainier GSA, it need not consider Blair's motion to strike the portions of Third-Party Defendants Reply relating to those contractual claims, and as such the Court denies that part of Blair's motion as moot.  (R. 170, Mot. to Strike 2.)

*Coatings, Inc.*, No. 02 C 8800, 2004 WL 2108413, at *4 (N.D. Ill. Sept. 21, 2004) (citing *Frazer v. A.F. Munsterman, Inc.*, 123 Ill. 2d 245, 255 (1988)). Importantly, "implied indemnity actions lie only where one party is in some sense 'at fault,' and the other party is blameless though liable—typically because of strict liability, *respondeat superior,* implied warranty, or some other legal principle that imposed liability regardless of fault." *Mizuho*, 341 F.3d at 652 (citations omitted).

Here, while Blair has bolstered its equitable indemnity claim by providing additional allegations regarding Blair's and Third-Party Defendants' work on the GSA bond offering, Blair's equitable indemnity claim still fails. First, as the Court noted in its initial opinion, here, RRA and Blair had an indemnity provision in the Engagement Agreement,[4] and Blair has still identified no cases in which a court recognized an implied indemnity claim where the parties' contract already expressly provides for indemnity. Even though it was in a different procedural context, the Seventh Circuit has explained that implied indemnity claims are appropriate where the "parties have failed to include an indemnity provision in an agreement and there is reason for the court to read such a provision into the agreement," not where, as here, the parties have already negotiated and agreed to an indemnity provision. *Mizuho*, 341 F.3d at 652.

Several other courts have similarly rejected implied indemnity claims where the parties had an express indemnity agreement.[5] *See, e.g.*, *Fid. & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983) ("resort to implied indemnity principles is improper when an express indemnification contract exists"); *Collier v. Land & Sea Rest. Co.,*

---

[4] Blair claims that Rainier GSA is also a party to the agreement as an alter ego of RRA, and the Court has allowed those alter ego allegations to survive Third-Party Defendants' motion to dismiss.
[5] Although some of these cases arose in different procedural contexts and applied different state law, they are still persuasive and aid the Court's analysis of the context in which courts allow implied indemnity claims.

*LLC*, 972 F. Supp. 2d 870, 875 (W.D. Va. 2013) (dismissing plaintiffs' equitable indemnification claim because there was an express contract provision governing indemnification); *Nat'l Labor Coll., Inc. v. Hillier Grp. Architecture N.J., Inc.,* 739 F. Supp. 2d 821, 830–31 (D. Md. 2010) (same); *General Motors Corp. v. Maritz, Inc.*, 2009 WL 1259376, at *3-4 (D. Ariz. May 6, 2009) (same); *C & E Servs., Inc. v. Ashland, Inc.*, 498 F.Supp.2d 242, 266–67 (D.D.C. 2007) (rejecting implied indemnity claim due to express indemnity provision); *Dacotah Mktg. & Research, L.L.C. v. Versatility, Inc.*, 21 F. Supp. 2d 570, 580 (E.D. Va. 1998) ("Principles of implied indemnity do not operate in the face of an express indemnification contract."); *New Zealand Kiwifruit Mktg. Bd. v. City of Wilmington,* 825 F. Supp. 1180, 1194 (D. Del. 1993) ("courts have clearly limited implied indemnification to situations in which no express indemnification exists").

Blair's implied indemnity claim also fails because Blair has failed to allege a qualitative difference between its conduct and Third-Party Defendants' conduct. Blair has now alleged that it assisted RRA in preparing the GSA bonds, that Blair and either RRA or its outside counsel drafted portions of the bonds, and that RRA, not Blair, ultimately used the alleged infringing documents in its bond offering. (Am. Third-Party Compl. ¶¶ 79-82.) These allegations, while adding a few details about the preparation of the GSA bonds, are still insufficient to allege a qualitative difference in the parties' conduct because the allegations of the complaint explicitly indicate that the Blair and RRA worked together to prepare, draft, and issue the GSA bonds. (*Id.* ¶ 8.) Blair fails, for example, allege any content in the bonds that RRA, not Blair, drafted, whether RRA's outside counsel actually made any substantive contributions to the bonds, and how RRA and Blair's roles in disseminating and issuing the bonds differed. Several courts have rejected implied indemnity claims where the plaintiff similarly fails to allege a legitimate

qualitative difference between the parties' conduct. *See, e.g.*, *Duncan-Williams, Inc. v. Capstone Dev., LLC*, 908 F. Supp. 2d 898, 911 (W.D. Tenn. 2012) (rejecting implied indemnity claim in part because both parties were at fault and thus there was no qualitative difference between parties' conduct); *Hahn v. Norfolk & W. Ry. Co.*, 241 Ill. App. 3d 97, 102–03, 608 N.E.2d 683, 688 (1993) (same); *Devine v. Cyprus Indus. Minerals*, No. 90 C 1335, 1991 WL 76123, at *2 (N.D. Ill. May 3, 1991) (dismissing third-party implied indemnity claim in part because plaintiff failed to sufficiently allege qualitative distinction between parties' conduct).

Accordingly, the Court dismisses Blair's implied indemnity claim with prejudice.

## III. Contribution Claims

Blair has moved to strike Third-Party Defendants' arguments in its Reply regarding Blair's contribution claims. In its Reply, Third-Party Defendants argued, in part, that the Court should dismiss Counts VI (contractual contribution against RRA) and VII (contractual contribution against Rainier GSA). (R. 164, Third-Party Defs.' Reply 14-15.) In its Motion to Dismiss, however, Third-Party Defendants only moved to dismiss Blair's contractual claims against Rainier GSA (Counts III, IV, and VII) and Blair's implied indemnity claim (Count V). Third-Party Defendants did not move to dismiss Count VI, the contractual contribution claim against RRA, and thus the Court strikes all Third-Party Defendants' arguments regarding the dismissal of that Count.

As to Count VII, the contractual contribution claim against Rainier GSA, in their Motion to Dismiss, Third-Party Defendants' entire argument for dismissal was that Rainier GSA was not a party to the Blair-RRA agreements and could not be held liable as RRA's alter ego. (R. 155, Mot. to Dismiss 4-7.) Third-Party Defendants did not present any arguments regarding Blair's failure to allege the elements of a contribution claim in its Motion to Dismiss, and it may not

present those arguments for the first time in their Reply brief.  *Rives v. Whiteside Sch. Dist. No. 115*, 575 F. App'x 678, 680 (7th Cir. 2014) (litigants waive arguments they raise for the first time in a reply brief).  Accordingly, the Court also strikes Third-Party Defendants' arguments in their Reply regarding Blair's failure to allege the elements of a contribution claim.

## CONCLUSION

For the foregoing reasons, the Court denies Third-Party Defendants motion to dismiss Blair's contractual claims against Rainier GSA (Counts III, IV, and VII), grants Third-Party Defendants motion to dismiss Blair's implied indemnity claim (Count V), and grants in part and denies in part Blair's motion to strike portions of Third-Party Defendants Reply brief.


**Dated:** January 11, 2017


ENTERED

AMY J. ST. EVE
**United States District Court Judge**