IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UIRC-GSA HOLDINGS, LLC,<br>    Plaintiff,<br><br>  v.<br><br>WILLIAM BLAIR & COMPANY, LLC, and<br>MICHAEL KALT,<br>    Defendants.<br>──────────────────────────────<br>WILLIAM BLAIR & COMPANY, LLC,<br>    Cross-Plaintiff,<br><br>  v.<br><br>UIRC-GSA HOLDINGS, LLC and URBAN<br>INVESTMENT RESEARCH CORP.<br>    Cross-Defendants.<br>──────────────────────────────<br>WILLIAM BLAIR & COMPANY, LLC<br>    Third-Party Plaintiff,<br><br>  v.<br><br>RAINIER REALTY ACQUISITIONS GP., LLC<br>And RAINIER GSA PORTFOLIO I, LLC,<br>    Third-Party Defendants.<br>──────────────────────────────<br>RAINIER REALTY ACQUISITIONS GP., LLC<br>and RAINIER GSA PORTFOLIO I, LLC,<br>    Counter-Third-Party Plaintiffs,<br><br>  v.<br><br>WILLIAM BLAIR & COMPANY, LLC,<br>    Third Party Defendant. | Case No. 15 CV 9518<br><br>Judge Robert W. Gettleman |

**MEMORANDUM OPINION AND ORDER**

1

Plaintiff UIRC-GSA Holdings, Inc. ("UIRC-GSA") sued William Blair & Company ("Blair") and Michael Kalt ("Kalt") for alleged violations of the Copyright Act, 17 U.S.C. § 101. Blair brought four counterclaims against UIRC-GSA and Urban Investment Research Corp. (together, "UIRC"). Blair also brought a third-party complaint against Rainier Realty Acquisitions GP ("RRA") and Rainier GSA Portfolio I, LLC ("Rainier GSA") (together, "Rainier") that alleged contractual indemnity, among other claims. Rainier brought a counterclaim against Blair, alleging breach of good faith and fair dealing. On June 30, 2022, after lengthy litigation, this court issued a final judgment on the parties' summary judgment motions (Doc. 500) and closed the case. On August 24, 2022, the court clarified and amended its judgment (Doc. 507). After unsuccessfully meeting and conferring to resolve Blair's claim for damages in connection with its successful contractual indemnity claim against RRA, Blair filed the instant motion for contractual damages (Doc. 519). For the reasons discussed below, the court grants in part and denies in part Blair's motion.

## BACKGROUND

The court has extensively discussed this case's factual background in its prior decisions, but outlines such background as relevant to the instant motion. The relationship between Blair and RRA is governed by two agreements: the Engagement Agreement and Indemnity Agreement. With the Engagement Agreement, RRA retained Blair to serve as an investment banker and placement agent for bond offerings, with Kalt as relationship manager. Blair helped RRA create and structure its bond offering. For example, Blair suggested that RRA create a new entity called Rainier GSA to issue the bonds, although the only party listed in both the Engagement Agreement and the Indemnity Agreement is RRA.

Pursuant to the Indemnity Agreement, RRA agreed to indemnify Blair for certain losses and expenses. The Indemnity Agreement states that RRA:

> "hereby agrees to indemnify and hold harmless William Blair & Company, LLC ("Blair") and each of the Other Indemnified Parties (as defined below) to the full extent lawful, from and against any and all losses, claims, damages, liabilities (collectively, "Losses") and reasonable expenses incurred by them (including all fees and expenses of Blair's and each of the Other Indemnified Parties' counsel and all of Blair's and each of the Other Indemnified Parties' reasonable travel and other out-of-pocket expenses incurred at [RRA]'s request or otherwise incurred and reasonably required in connection with the investigation of any pending or threatened claims or preparation for any pending or threatened litigation or other proceedings) but subject to compliance with paragraph 3 (collectively, "Expenses") arising out of or relating to Blair's engagement under such letter agreement . . . ."

The trouble between Blair and RRA began in October 2015 when UIRC sued Rainier GSA, alleging that Rainier GSA infringed UIRC's copyrights by using certain copied deal documents for its later transaction with Blair. Prior to Blair's relationship with Rainier, Blair was UIRC's investment banker and placement agent for certain bond offerings, with Kalt as UIRC's relationship manager. Like Blair with RRA, Blair and UIRC executed two agreements to govern their relationship: an engagement agreement and an indemnity agreement. During the course of their relationship, and allegedly unbeknownst to Blair, UIRC copyrighted these deal documents. In its case against Rainier GSA, UIRC claimed that Blair approached RRA and helped RRA "mimic" UIRC's successful bond offerings, using UIRC's documents. UIRC claimed that Kalt actively encouraged and personally directed Blair's employees and Blair's outside counsel to use UIRC's materials to solicit other clients, including RRA.

In September 2016, Rainier GSA and UIRC settled those claims, and UIRC then sued Blair and Kalt. Blair claimed that Rainier GSA "convinced UIRC to shift its focus to and sue Blair." In response, Blair brought a third-party complaint against RRA and Rainier GSA, and counterclaims against UIRC. Blair contended that it was unaware of the settlement between

3

UIRC and Rainier GSA, and that both UIRC and Rainier had separate obligations under their indemnity agreements with Blair to provide notice of the settlement to Blair and to obtain a release. Rainier and UIRC countered that Blair was involved in the preliminary settlement negotiations, and that Blair's grievances regarding the settlement were disingenuous.

This court determined that UIRC had no obligation to indemnify Blair or inform and obtain a release from Blair regarding UIRC's settlement with Rainier GSA. See UIRC-GSA Holdings, LLC v. William Blair & Company, LLC, No. 15-CV-9518, 2022 WL 2356623, at *3–4 (N.D. Ill. June 30, 2022). Based on traditional principles of contract interpretation, the court concluded that the indemnity agreement between UIRC and Blair applied only to third-party claims, meaning that UIRC was not required to indemnify Blair for claims that Blair brought against UIRC (i.e., direct claims). The court emphasized that certain provisions in the indemnity agreement—which is identical to the Indemnity Agreement between Blair and RRA— "quintessentially relate to third-party claims." Id. at *3.

The court also evaluated the Indemnity Agreement between Blair and RRA, which is the subject of the instant motion. Because the court determined that the Indemnity Agreement identifies only one Rainier party (RRA) and says nothing about RRA's subsidiaries or affiliates (i.e., Rainier GSA), the court held that Rainier GSA was not bound by the Indemnity Agreement between RRA and Blair. Id. at *5. In its final judgment, the court granted summary judgment for Blair on its claim for contractual indemnity against RRA because it found that Blair established that: (1) the Engagement Agreement and Indemnity Agreement are valid and enforceable; (2) Blair substantially performed under both agreements; (3) RRA failed to perform its indemnity obligations; and (4) RRA's failure to perform caused damage to Blair. See UIRC-GSA Holdings, LLC v. William Blair & Company, LLC, No. 15-CV- 9518, 2022 WL 18493491,

4

at *1 (N.D. Ill. Aug. 25, 2022). As Blair states, "[a]ll that remains is to determine the amount owed."

## DISCUSSION

The parties are unable to reconcile whether the Indemnity Agreement between RRA and Blair extends to certain losses and expenses associated with three identified categories of claims, which are losses and expenses incurred in: (1) bringing and defending the third-party claims in this lawsuit (Category 1); (2) enforcing the Indemnity Agreement against RRA (Category 2); and (3) Blair's participation as a third party prior to being added as a defendant in this action (Category 3). The court addresses the Indemnity Agreement's applicability for each category.

Indemnification agreements, like all agreements between parties, are subject to the rules of contract interpretation. See Virginia Sur. Co. v. N. Ins. Co. of New York, 866 N.E.2d 149, 153 (2007). Each case turns on the "particular language used, and the particular factual setting to which the indemnification clause is sought to be applied." See Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp., No. 93 C 3065, 1995 WL 275594, at *3 (N.D. Ill. May 8, 1995), aff'd, 73 F.3d 150 (7th Cir. 1996). If a contract is "clear and unambiguous, the court must determine the intent of the parties solely from the plain language of the contract." Hanover Ins. Co. v. N. Bldg. Co., 751 F.3d 788, 792 (7th Cir. 2014) (internal citations omitted).

The court starts with Blair's foundational argument that RRA's general objections to Blair's allocations are insufficient to warrant reduced contractual damages from this court, in any and all of the categories. Blair cites Oasis Legal Fin. Operating Co. LLC v. Chodes, No. 17-cv-0358, 2021 WL 929095 (N.D. Ill. Mar. 11, 2020), to argue that the court may disregard objections to fee requests that fail to specifically identify the disputed fees. Id. at *2. The court agrees that RRA must expressly object to specific allocations, and rejects RRA's assertion that

5

Blair has failed to properly delineate its expenses to allow RRA to do so. Blair has provided just under 400 pages of color-coded invoices from Foley & Lardner, which clearly indicate which expenses are associated with which activities, which attorney, and the hourly rate.[1] If RRA is unhappy with certain allocations in Blair's contractual damages request, RRA had plenty of time to offer an alternative calculation.

The court next evaluates whether Blair is entitled under the Indemnity Agreement to recover its requested losses and expenses under Category 1 (($2,661,083). Category 1 encompasses Blair's costs in its defense against UIRC's copyright claims and counterclaims, its counterclaims for indemnification and breach of contract against UIRC, its third-party claims for indemnification and breach of contract against Rainier GSA, and its defense against Rainier GSA's counterclaims. Because this court has determined that the identical Blair-UIRC indemnity agreement contemplated only third-party claims, Blair must establish that its claims are third-party claims in order to recover contractual damages from RRA under the "law of the case." The fact that a claim is a third-party claim relative to the lawsuit generally does not necessarily mean that it is a third-party claim relative to the Indemnity Agreement.

Blair argues that its defense and counterclaims against UIRC are third-party claims because UIRC sued Blair for Blair's actions in the Blair-RRA transaction. According to Blair, but for Blair's agreement with RRA, UIRC would not have sued Blair for copyright infringement. The court agrees that this argument is logical, but it agrees with RRA that Blair's expenses in bringing certain counterclaims against UIRC (such as Blair's claim for contractual indemnity against UIRC) should not be indemnified. As RRA argues, Blair's claim for costs in

---

[1] Pink and green highlights demonstrate Category 1 expenses, with green for UIRC-related claims and pink for Rainier GSA; purple highlight demonstrates Category 2 expenses; and blue highlight demonstrates Category 3 expenses. The court acknowledges that it is somewhat difficult to differentiate between the pink and purple highlight.

bringing its counterclaims against URIC did not arise out of Blair's relationship with RRA; instead, Blair incurred these fees due to its ongoing and independent relationship with UIRC. This muddies the water because Blair has not delineated its UIRC-related costs from each other, and RRA does not provide a compelling counter-calculation in line with its position (i.e., that Blair should have more granularly delineated its expenses). Accordingly, the court grants Blair's request for attorneys' fees associated with all its claims against UIRC.

For similar reasons, the court grants Blair's request for attorneys' fees associated with its claims against Rainier GSA and defense against Rainier GSA's counterclaims. This court determined on summary judgment that Rainier GSA is a third party to the Blair-RRA Indemnity Agreement, and but for Blair's engagement with RRA, UIRC would not have sued Blair, and Blair would have had no reason to file its third-party claims against Rainier GSA. Blair's relationship with Rainier GSA is distinct from Blair's relationship with UIRC because Blair did not have a prior and independent relationship with Rainier GSA.

RRA has one remaining, overarching argument against Blair's Category 1 expenses. According to RRA, the Indemnity Agreement contemplates only attorneys' fees that are incurred during the "investigation of and preparation for" claims or litigation, rather than Blair's filing, prosecution, and/or defense of such litigation. Blair counters that such an interpretation belies common sense and contradicts traditional principles of contract interpretation. The court agrees with Blair and concludes that Blair is entitled to indemnification for attorneys' fees associated with its defense from litigation.[2] RRA indemnified Blair against "reasonable expenses" that it incurred "arising out of or relating to" its engagement with RRA. A plain reading of this

---

[2] The court acknowledges that indemnification language that expressly required RRA to indemnify costs associated with defending litigation could have been clearer, but the availability of clearer language does not make the language at issue any less plain and unambiguous.

7

contractual language includes attorneys' fees and costs associated with the life cycle of litigation. The Indemnity Agreement's parenthetical language merely emphasizes what is included within such "reasonable expenses"; in particular, reasonable expenses include fees and expenses "of Blair's . . . counsel." The court does not interpret the subsequent parenthetical language ("all fees and expenses of Blair's . . . counsel . . . and other out-of-pocket expenses . . . otherwise incurred and reasonably required in connection with the investigation of any pending or threatened claims or preparation for any pending or threatened litigation") to be exhaustive, and even if it were exhaustive, preparation for "pending" claims and litigation would plainly include its defense. Thus, Blair is entitled to its expenses in Category 1.³

Next, the court evaluates whether Blair is entitled to all losses and expenses incurred in enforcing the Indemnity Agreement against RRA (Category 2). Blair acknowledges that this court interpreted the identical indemnity agreement between UIRC and Blair to exclude direct party claims, but Blair argues that enforcing the Indemnity Agreement against RRA is not a typical direct claim against RRA. According to Blair, "successful enforcement of the agreement against RRA arises out of or relates to Blair's engagement," and the indemnity provision uses broad language that encompasses "all" fees and expenses "in connection with" the Indemnity Agreement, without excluding enforcement costs.

RRA counters that the Indemnity Agreement does not cover Category 2 damages because they did not arise out of or relate to a third-party claim. Rather, these damages stem from the direct relationship between the parties. The court agrees with RRA that the Indemnity Agreement does not contemplate Blair's Category 2 damages. Courts look to the language of the

---

³ Blair notes that some of its Category 1 expenses overlap with its Category 2 expenses; because, as discussed below, the court denies Blair's request for its Category 2 expenses, the court does not grant Blair's request for the overlapping fees, although they are included in both categories.

indemnity agreement to determine whether an indemnity provision covers its enforcement. See, e.g., Ocean Tomo, LLC v. PatentRating, LLC, No. 12 C 8450, 2022 WL 2967351, at *1 (N.D. Ill. July 25, 2022). Here, the Indemnity Agreement does not expressly preclude losses or expenses resulting from enforcement. On the other hand, the Indemnity Agreement covers only losses and expenses that arise out of or relate to its "engagement under such letter agreement." Enforcement expenses do not rise out of the letter agreement (i.e., the Engagement Agreement); rather, enforcement expenses arise out of the Indemnity Agreement, and RRA's obligations under it.[4] Consequently, the court denies Blair's motion for contractual damages to the extent that it seeks attorneys' fees incurred in enforcing the Indemnity Agreement (Category 2) ($752,585).

Last, the court examines whether Blair is entitled to all losses and expenses incurred from Blair's participation in this lawsuit as a third party, prior to being added as a defendant. RRA does not dispute that Blair is entitled to recover these losses and expenses. Rather, what RRA disputes is whether Blair's attorneys' fees and costs incurred in this litigation are "commercially reasonable." Commercial reasonableness is the standard for determining attorneys' fees under a contractual fee-shifting provision, like an indemnity agreement. See Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp., No. 93 C 3065, 1995 WL 275594, at *3 (N.D. Ill. May 8, 1995), aff'd, 73 F.3d 150 (7th Cir. 1996). To determine whether costs are commercially reasonable, courts evaluate the stakes of the case and the opposing party's litigation strategy. See Medcom Holding Co. v. Baxter Travenol Lab., 200 F.3d 518, 521 (7th Cir. 1999). Courts

---

[4] Even if this were not the case, the court would still find that Blair's enforcement expenses were not commercially reasonable, as discussed below, because there is no guard against moral hazard in enforcement expenses. The Seventh Circuit interpolated a reasonableness requirement into indemnity agreements to guard against moral hazard, or the tendency the take risks and run up costs when someone else is paying the tab. See Medcom Holding Co. v. Baxter Travenol Lab., 200 F.3d 518, 521 (7th Cir. 1999). There is no incentive for Blair to keep indemnity enforcement costs low if Blair is assured that RRA will be paying for them.

9

also consider the market value of the services provided, otherwise known as "willingness to pay." See Balcor, 73 F.3d at 153. Where in-house counsel reviewed and paid outside counsel's legal bills, during the ordinary course of business and when ultimate recovery was uncertain, these factors weigh in favor of commercial reasonableness. See Medcom, 200 F.3d at 520.

Blair argues that Foley & Lardner's fees and costs for its legal services were commercially reasonable because the stakes of the case were high (UIRC claimed over $100 million in damages), and Blair's in-house counsel monitored and paid Foley & Lardner's invoices when ultimate recovery was uncertain. Further, Blair argues that these costs are commercially reasonable in light of RRA and UIRC's contentious litigation strategies, which were characterized by extensive discovery and a "scorched earth pleading strategy," and the observation that Foley & Lardner's hourly rates are "commensurate" with the average hourly rate charged in Chicago by other national law firms, as well as peer lawyers.

RRA counters that these fees and costs are commercially unreasonable because Blair, not RRA and UIRC, was the party that complicated and raised the contentiousness of the ligation. Moreover, RRA argues that Foley & Lardner's fees and costs are 50% higher than the "likely aggregate fees combined incurred by all the other UIRC and Rainier parties in this litigation." The court is not persuaded by either contention. First, the court declines to cast the blame for the contentiousness of the litigation because there is considerable evidence directing blame in both directions. Second, the court agrees with Blair that a comparison of Blair's costs and fees to the "likely" aggregate fees incurred by the other parties is conjectural and unhelpful, where RRA does not specifically object to any allocated expenses based on being unreasonable or unnecessary. In a contractual fee shifting case, the court's obligation to evaluate commercial reasonableness extends only to an overview of aggregate fees, not a detailed, hour-by-hour

review.  See Medcom, 200 F.3d at 520.  The court finds that the requested costs here are not so out of the proportion that they are unreasonable.  See Metavante Corp. v. Emigrant Sav. Bank, No. 05-cv-1221, 2009 WL 4556121, at *6 (E.D. Wis. Nov. 27, 2009), aff'd, 619 F.3d 748 (7th Cir. 2010).  Thus, the court concludes that Blair is entitled to contractual damages for its Category 3 expenses ($51,521).

Because the court grants Blair's request for its Category 1 and 3 damages, and denies its request for Category 2 damages, the court orders RRA to indemnify Blair for $2,112,260.[5]

## CONCLUSION

For the reasons stated above, the court grants in part and denies in part Blair's motion for contractual damages against RRA (Doc. 519).  RRA is ordered to indemnify Blair for $2,112,260.

**ENTER:**

*Robert W. Gettleman*
**Robert W. Gettleman**
**United States District Judge**

**DATE:   February 21, 2023**

---

[5] The court arrives at the final damages amount by subtracting Blair's requested Category 2 damages ($752,585) from its total requested damages ($2,864,845).  The court notes that the final damages amount ($2,112,260) is not the sum of Blair's requested damages for Category 1 ($2,661,083) and Category 3 ($51,521) because some Category 1 and Category 2 expenses overlap.

11